Case 22-874 Craven v. Erickson Case 22-874 Craven v. Erickson May it please the Court, for the Plaintiff Appellant, Jonathan Kartelli. The District Court committed error by denying the Plaintiff's motion for summary judgment and granting the Defendant's motion for summary judgment in this case. This case involves a contract between the two parties that involved five specific subsections labeled A through E. Each one of those subsections was triggered by a conditioned precedent in the contract, specifically that it would only take effect, and those obligations would only take effect upon the Defendant, upon the cessation of operations or the termination of the corporation for Enable Pay, Inc. The District Court committed error by failing to determine the actual date of cessation of operations, and instead... Was it not part of the record? I'm sorry? Wasn't it part of the record when the operations ceased? The... it was... It's disputed. It's... the District Court said that it was going to take, for the sake of argument, that operations had ceased, but it did not give us a date certain as to when that actually occurred, and instead began crediting actions that were taken prior to that date as part of the Defendant's obligations. And what I mean by that specifically is... What's your position on when operations ceased? We believe it ceased when they closed the New York office and they terminated the employees, which would be somewhere between January and March of 2014. So you don't know either? No, our position is that it was January 2014. But I think based on the evidence that was introduced as far as when the New York office closed in January, and I believe the last employee was laid off in March of 2014, and that's where the dispute lies. But for our purposes, we don't think that it actually makes a difference whether it's January or March, because... So, let me make sure I get the timeline right. When the New York office closed, after that your client is hired by the other entity, right? No, no. My client was hired by the other entity in 2012, prior to, and then was terminated simultaneously with the termination of the New York office. They were one action and the same. He was actually terminated by the defendant who was a senior vice president in that new company. So all of the requirements under the contract required the defendant to take actions subsequent to the termination of operations. Unless the 5% provision applies. Well, the 5% provision is a separate area to address, because the district court improperly gave new definitions to what was in the 5% provision, even though it acknowledged that the text of the contract was unambiguous. The interest, as noted- Wait, the judge acknowledged that it was not ambiguous? He acknowledged preliminarily that it was unambiguous, and that was at, it's in the- Because I thought this contract- Special appendix 19. With ambiguous terms. Best efforts and other terms that are terms of art. I would note also that the defendant notes in his brief that the contract was unambiguous, and that's at page 31 of the defendant's brief. The terms for interests are defined in the contract, and they are capitalized, and it's put in quotes to define. That is used capitalized throughout the entire agreement, except- What do you think your client was entitled to under these provisions that he didn't get? Well, it depends on which provision you're talking about. But with regard to- Tell us everything but E, and then we'll come back to E. Okay. With regard to Section A, there's supposed to be an opportunity for my client to be able to obtain those interests. There was no opportunity provided after the condition precedent date. So the condition precedent date is in 2014, but the district court continually acknowledged that he was offered a job at this company with options, stock options, in 2012. Those options disappeared upon his termination in 2014. There is nothing in the record that indicates that there were any opportunities or any offers to allow my client to be compensated under the contract subsequent to the termination of operations, the cessation of operations. So the opportunity clause in Section A was not met. And then this also goes- I understand you didn't want to discuss Section E, but there's an argument there regarding best efforts, because there's no efforts taken after that date. And then we have Section C. Section C was pled by my client. It was noted in the motion for summary judgment. It was not noted- Not really. There's so many- this is such a confusing record, because for the life of me, I don't understand why counsel can't keep straight which provision they're talking about. There's mislabeling of C and E and points of C and other things. It's hard to keep track, but there is no sense in which you- I don't think- in which you argued C as a separate breach. And even if you did, that under the law, the case that you cite, you don't just win if it's not opposed. You know that, right? I understand that, Your Honor. So you still have to make an argument, which you don't in your briefs, as to why you win on the summary record on that claim. Frankly, the fact that you didn't make an argument alone is enough to say you lose. But it's just ingenuous, I think, to say that you made a separate section C. My position is that it is referenced in the record, and it is referenced in the notice of motion, and it's referenced briefly in the memorandum of law. I understand that it's a brief cursory reference. However, I would also note that the defendant did not- There's a number of places in which the brief cursory note is clearly referring to another provision than section C. That doesn't convert it into a section C argument. I understood, Your Honor. But I would also note that the defendant did not raise any argument to dismiss the claims in section C, which are clearly pled in the complaint. Yet the court still granted- Unless they're not clearly pled in the complaint, then you certainly can't blame the defendants for not moving to dismiss a claim that is not apparently made. I believe they are listed in the complaint, Your Honor, as far as being a separate cause of action, because they are separate obligations. The section C required that the defendant shall require that such interest be allocated to the defendant. It's different from the opportunity argument in section A. So it's actually even more so that this is an affirmative duty upon the defendant. Now, the defendant not only has not taken affirmative duty, in fact, took affirmative actions to terminate my client and make sure he did not get any of those interests. So that's the difference in why it is a separate cause of action and why I believe it was pled in the complaint. At the very least- Mr. Count, I want to please be sure I understand your contention about what it is that your client was entitled to that he didn't get and what it was that Mr. Harrison was not entitled to and got. My client was entitled to both an opportunity to receive the similar interests that the defendant received from Midland Savings Bank or from whatever other- Even after he was terminated? Yes. Particularly after he was terminated, because that's contemporaneous with the time of the cessation of operations. Since both happened simultaneously, and I would say in a coordinated manner, to basically remove my client from any opportunity to receive this and terminate the business that had any value that he had invested all of this money in- I thought the new employee, new employer terminated the client. Now, he went on to stay on with that company, continued, and ended up having his stock options vested. So he ended up getting real compensation for his involvement with the company. He ended up becoming CFO of that company as well. And your client never got his shares vested? My client got nothing from this. My client got nothing because he had options that were worthless once he was terminated. So that's the fundamental thing here. And the whole point to this- Is it your position that the termination was wrongful? No, this is not a wrongful termination because it was- You said it will, right? Yes, but that's subject to a separate agreement with Midland Savings Bank. But the difference is that the defendant had an independent contractual obligation to make sure that my client was able to receive an opportunity to get that compensation and to use best efforts to make sure that he did so. So he was supposed to intercede on your client's behalf with Midland? Yes. That's his contractual obligation is to make sure that my client received that because he had received the benefit as his partner for that investment. So he had to intercede with Midland on behalf of your client even though he was just an employee of Midland as well, right? That is his contractual obligation whether it was Midland or any other similar business that he was supposed to make efforts- It's a reasonable contractual obligation. I mean, he couldn't force Midland to give your client the benefits that he thinks he deserves, right? But he has an obligation to at least make best efforts. And he did not make that effort at all. There's no indication in the record that he made any efforts. To the best of your knowledge. There's no- I'm sorry, Your Honor, go ahead. To the best of your knowledge, he didn't make any efforts. There's nothing in the record to indicate that, and no. Well, we'll ask counsel. All right, thank you, Mr. Kurtelli. Thank you, Your Honor. We'll hear from Mr. Murphy. And I do think, Mr. Murphy, at least speaking for myself, if you could at least focus the beginning of your remarks on Section 8. And specifically, the question is, if we don't know when there's ceasing of operations, how do we know when to look for best efforts taking place? That's the question. Thank you, Your Honor. Good morning. May it please the Court, my name is James Murphy. I represent the defendant, Stephen Erickson. The thorough, well-reasoned decision and order of the district court should be affirmed. It goes without saying- Did Mr. Erickson make any efforts on Mr. Allen? The whole idea of the relationship with Midland was that they were basically taking the business that they had created together, EnablePay, and they decided together, they all consented to the deal, to transfer all the assets that they had in EnablePay to Midland and become employed by Midland at the same time. That contract for the sale basically had earn-out consideration in it, because they had only received $150,000 at the time of the closing, and there was over $2 million that would have been paid out after the closing if certain performance metrics had been met. If they had been met, Mr. Erickson and Mr. Craven would have received exactly, exactly the same thing. They marched shoulder to shoulder into this deal. Mr. Craven took a degree from Notre Dame Fordham Law School. He worked for three of the largest law firms in the city here. He was general counsel to EnablePay. He negotiated the asset purchase agreement. He worked with Doug Tucker, who was the general counsel of MSB, to close the transaction. He knew that his employment was terminable at will. He signed a contract to that effect. He knew that the earn-out consideration under the AP- Did Mr. Erickson do anything on behalf of Mr. Craven? That was the question that we ended with opposing counsel. He was supposed to do best efforts, and did he do anything? After ceasing of operations, right? That's the predicate. It's a timing question. The ceasing of operations, the business was sold in 2012. Right. I know, but the district court says, I'm not going to resolve when that predicate question occurred. It's disputed. You say 2012. He says 2014. So, for our purposes, let's assume 2014 is when this provision kicks in. Okay? What is there in the record to look to, and I'd be happy to have you point it to me- Sure. To look to to see what best efforts were made, or any efforts, or best efforts, after January 2014? Any efforts. Any efforts. Well, Judge, I think we have to kind of step back for a moment to look at the terms of the contract itself, because it goes without saying that the fundamental purpose of contract interpretation is to figure out what was the intent. Why did they sign this agreement? What was the intent? Right. Just to the district court, and maybe you're moving away to a different theory, but the district court said, I'm not going to resolve the factual dispute on when ceasing of operation occurred. But whenever it occurred, because he had the job with MSB, and he was at-will employee, and the other various forms of the contract, once he got terminated, there was nothing to do. But the contract had no, in other words, the intent was only to prevent my client from leaving EnablePay without giving Mr. Craven, plaintiff, the opportunity to tag along. Because that was what had happened here by way of factual background. They start this company in 2007. One year later, they are starved for cash, and they have to raise some capital. They convert it from a New York LLC to a Delaware corporation, and they raise $2 million from investors. Instead of being 50-50, they're now 33%, 33%, and 33% is owned by these other investors who make capital contributions of $2 million. At that moment, Mr. Craven says, you must sign this agreement. Why? What's the intent of it if you look at the terms of the agreement? Because it says that when Mr. Craven invested money and they obtained the additional financing, he wanted to ensure that my client, who had really the background in the business, would not leave EnablePay without taking him with them. It was essentially a tag-along agreement. And use his best efforts to make sure that he got reimbursed for his contributions? Only if he became an investor or an owner of a similar business. That's what the agreement says. It says, I will not become an owner of a business, a similar business, or an investor in a similar business without giving you the opportunity to tag along. He didn't become an owner of a similar business. He didn't become an investor. They sold their company. They both decided to sell their company to MSB. He didn't become an investor. The agreement doesn't even apply. Why did Erickson get stock options that he invested and Craven never did? Craven received 20,000 options just like Plaintiff received 20,000 options. My client received 25,000 options when they were hired. 5,000 of his options vested, he never exercised them. That's factual. Doug Tucker, who's the general counsel of MSB, submitted a declaration in connection with the motion in the court below. He indicates 5,000 of the shares vested, Craven's shares, he didn't exercise the option to exercise and convert them to stock. He had options. They had the same deal. And it's just, this agreement was not intended to apply to the MSB sale. So Erickson couldn't protect Craven once they went to Midland, right? Well, essentially the EnablePay business was basically inserted into Midland, and they now had a credit card processing division, which is what EnablePay did. So Craven maintained his same job he had with EnablePay at MSB. He got salary. He received stock options. My client received salary. He received stock options. They went into this deal together. And as I say, Plaintiff was a trained attorney. But this contract speaks to me about Craven wanting to be, wanting to more than tag along, wanting to take him with him at the same level. It almost says that, to obtain a position for Craven in a similar business, comparable to the position held by him with the company. He received the same exact title. He did the same job for Midland that he did with EnablePay. Then why was he terminated? Because it, the deal did not work. All of the year-end out consideration was not earned. In other words, they had to hit certain performance metrics. They didn't. Midland unwound. Whose responsibility was it to meet the performance metrics? Well, I mean, Midland takes over the business. They operate the business within Midland. Yeah, but there were performance metrics associated with the sale of EnablePay to Midland, right? They were, yeah, they were outlined in. Whose responsibility was it to meet those performance metrics? Well, it was the bank. It was Midland. The bank had to meet those performance metrics. And they never met them? Not at all. They didn't. All the earn-out consideration was lost. So you mean EnablePay was a disappointment to Midland because it didn't do what they hoped it would do? Midland, yes. And they did not, therefore, pay out the earn-out consideration. How come Erickson didn't get fired? Eventually. He did survive longer. He got demoted. He got demoted, and he's no longer with the bank. And then he got fired. Yeah, he's no longer with the bank. Counsel, I'm going to try one more time. Sure. Because it's the only, sort of, in my head, the piece I can't resolve. The predicate to all of these provisions is a timing predicate. At the time that the company is dissolved or ceases operation. And then when you go to E, I'll use my best efforts to obtain the position. So, again, why isn't it the right way to analyze this to say, since we don't have resolved the factual dispute as to when that happened, the predicate, that we have to look at any best efforts made, something in the record to show best efforts after January 2014. Is there anything to look to, or why is that the wrong way to think about it? Because you have to look at the intent of the agreement. And if you look at the intent of the agreement, it was to prevent Erickson from leaving EnablePay, from walking out of EnablePay without- So you think this link, I mean- That's the intent of it. You think this link is ambiguous, and therefore we- It's not ambiguous. It clearly says, it says, if I decide to become an owner or an investor in a similar business, similar business being a credit card processing business, I promise I'm not going to leave you without giving you the opportunity to come along with me. You know, it's an opportunity. I'll use efforts to bring you along. So that's what happened. They decided to- But it happened before- Which he did. Which he did. Right. So, therefore, once- Once it was- Yeah, they sold their company. Once there's termination, it's futile to make best- Like, what- I just don't understand the- Again- I want to get purchase on the argument. I get the idea he'd already had the job. Once he has the job, it's out of his hands. What excuses- Because- Some kind of best efforts once it kicks in? Because plaintiff could have, when he was negotiating these contracts with Doug Tucker, who was the general counsel of MSB, he could have said, look, his options vested over four years, as did my clients. Same thing. His options four years, my clients four years. He could have said to MSB, look, I want a guaranteed contract for four years until these options vest. And you can't fire me unless it's for cause or something like that. But you have to keep me on for four years to let these options vest. But couldn't- He didn't do it. It doesn't- Neither of them had that provision. They were all- They were both terminable at will. And they could have- Why did Erickson get more stock options than Craven? Because he was made president of the Merchant Credit Card Division within MSB, and plaintiff was made a director. So he was below Erickson. But ultimately, what was the intent of this agreement? This agreement really should not even apply to this MSB transaction, because the intent was to prevent my client from walking away after plaintiff had invested money in AblePay, and just walking away and saying, bye, I'm going to join a similar business. I'm going to become an owner in a similar business. I'm going to invest in a similar business. And see you. Nice knowing you. And that didn't happen. That didn't happen. They both became employees. It didn't happen. They both- They decided- They made a business decision. And they sold. They took a chance. And the earn-out consideration, as I say, it was contingent. And my client wishes that it had worked out, because they would have received the exact same thing. To the penny, it would have received exactly the same thing. Since they both owned a third of EnablePay, they would have received exactly the same thing. And they both went in with their eyes open. They knew the deal was risky. And unfortunately, it didn't work out. Who drafted the contract of sale? Well, general counsel for EnablePay is Mr. Craven. He's an attorney. Went to Fordham. He worked for Morgan Lewis. He was Hubbard & Reed, Skadden Arps. He was general counsel to the company. He negotiated the deal. And now he's saying, oh, after we decided to do this deal together, and it doesn't work out, you now have to hire me. That's preposterous. All right. Thank you, counsel. Thank you very much. Thank you. Mr. Crutelli, two minutes. Thank you, Your Honor. Just a few brief points. One, with respect to the last note that counsel made regarding the drafting of the contract, that is disputed in the record. It was argued in depositions that this was jointly drafted between the parties because there were numerous edits that were made to that contract. Both parties were lawyers, right? I don't ‑‑ I believe so. Was your party? My client is an attorney, yes. To be honest, I don't remember seeing in the record that the defendant was an attorney. That's not something that I remember off the top of my head. But my client is an attorney, and when this contract was drafted, there were edits that were made to this contract. There were drafts that went back and forth. So to say it was just drafted by one without collaborative input of the other makes it sound like this was ‑‑ So it was an arm's length negotiation. Yes. Okay. And one of the things that you heard defense counsel just mention is that even their position now is that this contract is unambiguous. And this brings me back to my point regarding section A. What was his client supposed to do that he didn't do? Well, one, after his contractual obligations triggered, which is ‑‑ Which contractual obligations? Contractual obligations to provide an opportunity to my client to receive those similar interests, to use best efforts. Well, according to your adversary, and please correct me if I'm wrong, both of you were hired by the new company. So he didn't leave your client high and dry. You went over there and you got the same package of options. Yes, Your Honor, but that's two years before. So what else were you entitled to at that point that you didn't get? And in 2014 is when my client becomes entitled to the defendant taking best efforts and providing that opportunity. So first of all, this agreement applies to an investment in a new entity. And neither of you did that, right? It wasn't my belief that it was limited only to if you were an investor in that company, but just that you had an interest in that company as defined by it. Beneficial owners of any class of capital stock, membership, or other interests. So I don't believe it's just strictly an investment because he received vested stock options. Like your client did. Yeah, no, my client did not receive vested stock options. My client received ‑‑ Your client received stock options. Correct. But didn't wait until, was not there when they vested. He wasn't permitted the opportunity to vest those 20,000. He was permitted the opportunity to vest 5,000, but that is certainly not similar to the 25,000 that the defendant received. That's because your client wasn't employed. He wasn't entitled to the benefit of options that had not vested. That is correct. However, it was ‑‑ So how is that his client's fault? Because his client signed a contract providing that he would make such allocations, that he would allocate, that he would require such allocations be made to the plaintiff in exchange for the plaintiff's investment in the company back when the contract was signed. This is forward looking. This talks about new investment. I'm sorry? A is forward looking. It talks about new investment. Yes, it talks about when they're receiving these additional options, he is supposed to provide this opportunity to the plaintiff. So whatever options may have ‑‑ You still can't answer my question about what it is that Mr. Erickson got that your client didn't get. And was contractually entitled to. He received $25,000 in vested stocks that my client did not receive. And my client, that one of the conditions of this deal, of him making this kind of an investment, was that he was supposed to receive the similar interest to the defendant. He got the same stock option. The option, but he was terminated prior to them having any value by the defendant. Well, that's a matter of dispute. He was employed not by Mr. Kreeve, but he was employed by the company. The company discharged him. And he was an Atwill employee. How is this his client's fault? As the defendant noted, the defendant was higher in the organizational structure of this new entity and played a role in my client's termination. He's the one that actually issued the order of termination to my client. The company terminated him. He was an Atwill employee of the company. But he made no efforts to either make sure that my client received such compensation or to offer my client a similar opportunity. Instead, it was a cost‑cutting measure. You got the same stock option. But he was terminated just before. Those options vested in March of 2014. And my client was terminated in January to make sure they didn't vest. But the defendant was able to stay on and receive those options, even though he had already received the benefit of the deal that they had both negotiated. He had received this investment. You would have had a plausible argument along those lines if you had written a contract or if your client had signed a contract that contained those provisions. He didn't do it. Respectfully, Your Honor, I think that there's a part of this contract, particularly Section A, that states that he's supposed to be offered that opportunity by the defendant. And that only takes place after the enabled pay ceases operations. We don't have any efforts. We don't have any opportunity that was offered after the cessation of operations. And if the contract is unambiguous, as the defendant just acknowledged, then what is in the record? What if he didn't run the company? He was an employee. Then he could have made any other efforts to make sure that my client received similar interests. He could have made any efforts whatsoever. Okay. Thank you, Counsel. Thank you, Your Honor.